WedIN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| YOSHIRO P. SANNEY, #12275-122, <br><br> Plaintiff, <br><br> vs. <br><br> HALAWA MEDICAL UNIT; MEDICAL UNIT STAFF AND ADMIN TEAM, BARNEY TOYAMA, M.D.; JOHN DOE 1, JANE DOE 1; JOHN DOE 2, <br><br> Defendants. | CIVIL NO. 20-00141 HG-WRP <br><br> ORDER DISMISSING FIRST AMENDED COMPLAINT AND DENYING MOTION FOR APPOINTMENT OF COUNSEL |

## ORDER DISMISSING FIRST AMENDED COMPLAINT AND DENYING MOTION FOR APPOINTMENT OF COUNSEL

Before the Court is pro se Plaintiff Yoshiro P. Sanney's ("Sanney") first

amended prisoner civil rights complaint ("FAC") brought pursuant to 42 U.S.C.

§ 1983, ECF No. 12, and his Motion for Appointment of Counsel ("Motion"), ECF

No. 14.  Sanney claims that Defendants Barney Toyama, M.D., John Doe 1, Jane

Doe 1, and John Doe 2[1] violated his rights under the Eighth Amendment by

---

[1] In his original Complaint, Sanney also named as Defendants the "Halawa Medical Unit" and the "Medical Unit Staff and Admin Team."  ECF No. 1 at 1–2.  The Court previously dismissed Sanney's claims against these Defendants.  ECF No. 4 at 9–10.  The "Halawa Medical Unit" and the "Medical Unit Staff and Admin Team" are therefore TERMINATED as Defendants.

denying him adequate medical care at the Halawa Correctional Facility ("HCF").[2]

Sanney names all Defendants in both their individual and official capacities.

For the following reasons, Sanney's claims for money damages and prospective declaratory or injunctive relief against Defendants in their official capacities are DISMISSED with prejudice.  Sanney's denial-of-medical-care claim against Dr. Toyama in his individual capacity is DISMISSED with prejudice.  Sanney's claims against John Doe 1, Jane Doe 1, and John Doe 2 in their individual capacities are DISMISSED with leave granted to amend.  In order to proceed against the Doe Defendants, Sanney must file an amended pleading that cures the deficiencies in his claims on or before Wednesday, July 7, 2021.  Sanney's Motion for Appointment of Counsel is DENIED without prejudice.

## I. <u>STATUTORY SCREENING</u>

The Court must conduct a pre-Answer screening of all prisoners' pleadings pursuant to 28 U.S.C. §§ 1915(e)(2) (if they are proceeding in forma pauperis) and 1915A(a) (if they allege claims against government officials).  Claims or complaints that are frivolous, malicious, fail to state a claim for relief, or seek damages from defendants who are immune from suit must be dismissed.  *See*

---

[2] Sanney was released from state custody, and he is currently incarcerated at the Federal Detention Center—Honolulu.  *See* Federal Bureau of Prisons,  https://www.bop.gov/inmateloc/ (search Yoshiro Sanney).

*Lopez v. Smith*, 203 F.3d 1122, 1126-27 (9th Cir. 2000) (en banc); *Rhodes v. Robinson*, 621 F.3d 1002, 1004 (9th Cir. 2010).

Screening under 28 U.S.C. §§ 1915(e)(2) and 1915A(a) involves the same standard of review as that used under Federal Rule of Civil Procedure 12(b)(6). *See Rosati v. Igbinoso*, 791 F.3d 1037, 1039 (9th Cir. 2015) (citation omitted). Under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A claim is "plausible" when the facts alleged in the complaint would support a reasonable inference that the plaintiff is entitled to relief from a specific defendant for specific misconduct. *Id.* (citation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* The "mere possibility of misconduct" or an "unadorned, the defendant-unlawfully-harmed me accusation" falls short of meeting this plausibility standard. *Id.* at 678-79; *see also Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

Pro se litigants' pleadings must be liberally construed, and all doubts should be resolved in their favor. *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) (citations omitted). The Court must grant leave to amend if it appears the defects in the complaint can be corrected, *Lopez*, 203 F.3d at 1130, but if a claim or

complaint cannot be saved by amendment, dismissal with prejudice is appropriate.

*Sylvia Landfield Tr. v. City of Los Angeles*, 729 F.3d 1189, 1196 (9th Cir. 2013).

## II.  <u>BACKGROUND</u>[2]

Sanney was diagnosed with "inactive tuberculosis" in 2010.[3]  ECF No. 12 at

11.  In July 2016, Sanney began experiencing what he describes as "symptoms

consistent with pneumonia,"[4] including "chills, night sweats, incessant coughing,

shortness of breath, exhaustion[,] and loss of appetite[.]"  *Id.* at 7.  Sanney also

experienced difficulty sleeping because of "constant coughing, . . . discomfort, and

the aches in [his] joints, hips[,] and neck area."  *Id.*  Over the course of a month,

Sanney visited the HCF's medical unit three times and was seen by three different

nurses.  *Id.*

---

[2] On screening, Sanney's facts are accepted as true and construed in the light most favorable to him.  *Nordstrom v. Ryan*, 762 F.3d 903, 908 (9th Cir. 2014).

[3] Tuberculosis ("TB") is a potentially serious infectious disease that mainly affects the lungs.  *See* Mayo Clinic, Tuberculosis,  https://www.mayoclinic.org/diseases-conditions/tuberculosis/symptoms-causes/syc-20351250 (last visited May 28, 2021).  Inactive TB is a condition in which an individual has tuberculosis, but the bacteria remain in an inactive state and cause no symptoms.  *See id.*  Inactive TB can turn into active TB.  *See id.*  Symptoms of active TB include coughing, unintentional weight loss, fatigue, fever, night sweats, chills and loss of appetite.  *See id.*

[4] Pneumonia is an infection that inflames the air sacs in one or both lungs.  *See* Mayo Clinic, Pneumonia, https://www.mayoclinic.org/diseases-conditions/pneumonia/symptoms-causes/syc-20354204 (last visited May 28, 2021).  Symptoms of pneumonia may include coughing, fatigue, fever, sweating, shaking chills, and shortness of breath.  *See id.*

During Sanney's first visit to the medical unit, he was seen by John Doe 1. *Id.* John Doe 1 took Sanney's temperature and blood pressure, and he weighed Sanney. *Id.* Sanney told John Doe 1 about his various symptoms, including the chills, night sweats, coughing, shortness of breath, fatigue, and aches. *Id.* John Doe 1 listened to Sanney breathe with a stethoscope and said that it sounded as though Sanney had pneumonia. *Id.* John Doe 1 told Sanney he would schedule Sanney to see a doctor. *Id.*

Sanney claims that it usually took between three and seven days to see a doctor. *Id.* After waiting a week, Sanney submitted a medical request. *Id.* By this time, Sanney's condition "had continued to deteriorate." *Id.* He was sleeping "less and less," could eat "only bread and some soup," and was "coughing all the time." *Id.* During Sanney's second visit to the medical unit, he met with Jane Doe 1. *Id.* Jane Doe 1 took Sanney's temperature and blood pressure, and she weighed him. *Id.* Sanney described his symptoms to Jane Doe 1. *Id.* Jane Doe 1 suspected that Sanney had the flu and told him to drink a lot of water. *Id.* Jane Doe 1 also told Sanney that she would schedule an appointment for him to see a doctor. *Id.* at 8.

After a "few days," Sanney's condition "worsened considerably." *Id.* The aches in his neck, hips, and joints became "more pronounced," and walking became difficult because of his "inability to breathe freely[.]" *Id.* A week after his second visit to the medical unit, Sanney submitted a another medical request. *Id.*

5

During Sanney's third visit to the medical unit, he was seen by John Doe 2.[5]  *Id.*
John Doe 2 took Sanney's temperature and blood pressure, and he weighed
Sanney.  *Id.*  When Sanney said that he wanted pain medication, John Doe 2 told
Sanney that he first needed to see a doctor.  *Id.*  John Doe 2 told Sanney that his
symptoms appeared to be related to his tuberculosis.  *Id.*  John Doe 2 told Sanney
that he would schedule an appointment for him to see a doctor, and he sent Sanney
back to his cell.  *Id.*

After another week passed, Sanney filed a grievance against the medical unit
and its staff.  *Id.*  A "few days" later, Sanney saw Dr. Toyama.  *Id.* at 9.  Dr.
Toyama examined Sanney and ordered a chest X-ray.  *Id.*  The X-ray revealed an
"abnormality" in Sanney's "upper right lung."  *Id.*  Dr. Toyama then ordered a
second chest X-ray.  *Id.*  The second X-ray showed "some scarring in [Sanney's]
upper right lung."  *Id.*  A radiologist, Dr. Cavin, who reviewed the second set of
X-rays said that a CT scan[6] could be done "*if* further information [was] desired."
*Id.* (emphasis added).  Instead of ordering a CT scan, Dr. Toyama chose to

---

[5] According to Sanney, John Doe 2's first name is "Harvey."  ECF No. 12 at 8.

[6] A computerized tomography ("CT") scan combines a series of X-ray images taken from
different angles to create cross-sectional images of bones, blood vessels, and soft tissues.  *See*
Mayo Clinic, CT Scan, https://www.mayoclinic.org/tests-procedures/ct-scan/about/pac-
20393675 (last visited May 28, 2021).

prescribe a five-day dose of an antibiotic, Azithromycin.[7]  *Id.*  After taking this

medication, Sanney's "symptoms eased up a bit," his "coughing lessened," and his

"appetite slowly returned[.]"  *Id.*  Sanney was able to return to his job at the HCF's

Print Shop.  *Id.*

About a year later, just as Sanney thought that he "was healed," his

symptoms reappeared.  *Id.*  Sanney submitted another a medical request asking to

see Dr. Toyama.  *Id.*  Dr. Toyama examined Sanney and ordered another chest

X-ray.  *Id.*  A different radiologist, Dr. Summers, recommended that a CT scan be

taken.  *Id.*  Dr. Toyama ordered a CT scan at Pali Momi Medical Center.  *Id.*

On September 15, 2017, Sanney was called to the medical unit where he was

told that he had active tuberculosis.[8]  *Id.*  Sanney was immediately taken to the

Queen's Medical Center ("QMC").  *Id.*  Sanney was admitted and placed in an

isolation unit.  *Id.*  Additional tests for tuberculosis, however, came back negative.

*Id.*

---

[7] Azithromycin is used to treat certain bacterial infections in many different parts of the body.  *See* Mayo Clinic, Azithromycin, https://www.mayoclinic.org/drugs-supplements/azithromycin-oral-route/description/drg-20072362 (last visited May 28, 2021).

[8] It is unclear whether this diagnosis came from Dr. Toyama or a doctor at Pali Momi.

On September 19, 2017, a pulmonologist, Dr. Sato, performed a bronchoscopy.[9]  *Id.*  Dr. Sato concluded that Sanney had "invasive pulmonary aspergillosis."[10]  *Id.*  According to Sanney, Dr. Sato estimated that Sanney had the infection for between nine and twelve months.  *Id.* at 9–10.  Sanney immediately received another antibiotic, "Vericonazole."[11]  *Id.* at 10.

Sanney was discharged from the QMC on September 28, 2017.  *Id.*  Sanney continued taking Voriconazole until he developed an "adverse reaction" to the medication.  *Id.*  Because Sanney "did well" after he was taken off the medication, his outpatient visits ended in January 2019.  *Id.*  Sanney was transferred to the Saguaro Correctional Center in March 2019, where he did not have to see a doctor regarding his alleged lung injury.  *Id.*

Sanney filed his original Complaint on March 27, 2020.  ECF No. 1.  The Court issued an Order Dismissing Complaint with Leave to Amend on April 10,

---

[9] During a bronchoscopy, a thin tube is passed through the nose or mouth, down the throat, and into the lungs.  *See* Mayo Clinic, Bronchoscopy, https://www.mayoclinic.org/tests-procedures/bronchoscopy/about/pac-20384746 (last visited May 28, 2021).  The procedure allows a doctor to examine the lungs and air passages.  *Id.*

[10] Aspergillosis is an infection caused by a type of mold.  *See* Mayo Clinic, Aspergillosis, https://www.mayoclinic.org/diseases-conditions/aspergillosis/symptoms-causes/syc-20369619 (last visited May 28, 2021).  Invasive aspergillosis is the most severe form of the infection.  *Id.*

[11] Although Sanney refers to "Vericonazole," it appears that he means "Voriconazole." Voriconazole is used to treat serious fungal or yeast infections, such as aspergillosis.  *See* Mayo Clinic, Voriconazole, https://www.mayoclinic.org/drugs-supplements/voriconazole-oral-route/side-effects/drg-20095248?p=1 (last visited May 28, 2021).  The Court refers to this antibiotic as Voriconazole.

2020.  ECF No. 4.  The Court explained that Sanney's claims against state officials acting in their official capacities were barred by the Eleventh Amendment.  *Id.* at 8–10.  The Court further explained that Sanney failed to state an Eighth Amendment claim for denial of adequate medical care because he did not plausibly allege that a prison official was deliberately indifferent to a serious medical need. *Id.* at 10–18.

Sanney filed the FAC on March 4, 2021.  ECF. No. 12.  Sanney alleges that Dr. Toyama, John Doe 1, Jane Doe 1, and John 2 violated the Eighth Amendment by denying him adequate medical care.  Sanney seeks unspecified compensatory and punitive damages.  *Id.* at 16.

Sanney filed the Motion for Appointment of Counsel on March 10, 2021. ECF No. 14.  Sanney requests the appointment of counsel because he "is not well versed in the law."  *Id.* at 1.

## III.  **DISCUSSION**

### A.   **Liability under 42 U.S.C. § 1983**

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law.  *See West v. Atkins*, 487 U.S. 42, 48 (1988).

Section 1983 requires a connection or link between a defendant's actions and the plaintiff's alleged deprivation. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978); *Rizzo v. Goode*, 423 U.S. 362, 371-72, 377 (1976); *May v. Enomoto*, 633 F.2d 165, 167 (9th Cir. 1980). "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). A plaintiff must allege that he suffered a specific injury as a result of a particular defendant's conduct and must affirmatively link that injury to the violation of his rights.

## B.    Eleventh Amendment Immunity

Sanney names each Defendant both in his or her official capacity and individual capacity. ECF No. 12 at 1–3.

"The Eleventh Amendment bars suits for money damages in federal court against a state, its agencies, and state officials acting in their official capacities." *Aholelei v. Dep't of Pub. Safety*, 488 F.3d 1144, 1147 (9th Cir. 2007) (citation omitted); *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101–03 (1984). It does not bar official-capacity suits for prospective relief to enjoin alleged ongoing violations of federal law. *See Wolfson v. Brammer*, 616 F.3d

10

1045, 1065–66 (9th Cir. 2010); *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989).  Nor does it bar suits for damages against state officials in their personal capacities.  *See Hafer v. Melo*, 502 U.S. 21, 30–31 (1991); *Porter v. Jones*, 319 F.3d 483, 491 (9th Cir. 2003).

Any claims for money damages against Defendants in their official capacities are barred by the Eleventh Amendment and DISMISSED with prejudice. *See Mitchell v. Washington*, 818 F.3d 436, 442 (9th Cir. 2016) ("The Eleventh Amendment bars claims for damages against a state official acting in his or her official capacity." (citation omitted)).  Sanney also may not seek prospective declaratory or injunctive relief against Defendants in their official capacities based on events at the HCF, because he is no longer incarcerated there.  *See Dilley v. Gunn*, 64 F.3d 1365, 1368–69 (9th Cir. 1995) (concluding that prisoner's claims for injunctive relief were moot because he was transferred to another prison and had not demonstrated a reasonable expectation that he would be transferred back).

The Eleventh Amendment does not bar Sanney's claims for money damages against Defendants in their individual capacities.  *See Mitchell*, 818 F.3d at 442 (explaining that the Eleventh Amendment does not "bar claims for damages against state officials in their *personal* capacities").

## C.   Eighth Amendment:  Denial of Adequate Medical Care

Sanney alleges that Defendants violated the Eighth Amendment by denying him adequate medical care during his incarceration at the HCF.  ECF No. 12 at 6–13.

"Individuals in state custody have a constitutional right to adequate medical treatment."  *Sandoval v. County of San Diego*, 985 F.3d 657, 667 (9th Cir. 2021) (citing *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)).  "For inmates serving custodial sentences following a criminal conviction, that right is part of the Eighth Amendment's guarantee against cruel and unusual punishment."  *Sandoval*, 985 F.3d at 667.

"In order to prevail on a claim under the Eighth Amendment for inadequate medical care, a plaintiff must show 'deliberate indifference' to his 'serious medical needs.'"  *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014).  "This includes both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference."  *Id.* (quotation marks omitted).

To meet the objective element, a plaintiff must first demonstrate the existence of a serious medical need.  *Estelle*, 429 U.S. at 104.  Such a need exists if failure to treat the injury or condition "could result in further significant injury" or

12

cause "the unnecessary and wanton infliction of pain." *Edmo v. Corizon*, 935 F.3d 757, 785 (9th Cir. 2019) (per curiam) (quotation marks omitted).  "Examples of serious medical needs include [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Lopez*, 203 F.3d at 1131 (internal quotation marks omitted).  "Serious medical needs can relate to physical, dental and mental health." *Edmo*, 935 F.3d at 785 (quotation marks omitted).

If a prisoner "establishes a sufficiently serious medical need, he must then show the [official's] response to the need was deliberately indifferent." *Edmo*, 935 F.3d at 786 (quotation marks omitted).   "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).  The indifference to a prisoner's medical needs must be "substantial." *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1081–82 (9th Cir. 2013).  "Mere 'indifference,' 'negligence' or 'medical malpractice'" will not support a denial-of-medical-care claim.  *Id.* at 1082.  "Even gross negligence is insufficient to establish deliberate indifference to serious medical needs." *Id.*  Likewise, "[a] difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012)

(citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (en banc).  "To show deliberate indifference, the plaintiff must show that the course of treatment the [official] chose was medically unacceptable under the circumstances and that the [official] chose this course in conscious disregard of an excessive risk to the plaintiff's health."  *Edmo*, 935 F.3d at 786 (quotation marks omitted) (brackets in original).

### 1.   *Dr. Toyama*

Sanney alleges that Dr. Toyama denied him "timely access to specialized care," thereby violating his rights under the Eighth Amendment.  ECF No. 12 at 11.  Although Sanney sufficiently alleges that he had a serious medical need when he met with Dr. Toyama, he cannot plausibly allege that Dr. Toyama was deliberately indifferent to this need.

When Sanney initially met with Dr. Toyama, he "could barely walk," had aches, experienced "violent coughing," and had night sweats and the chills.  *Id.* at 8.  Sanney also got sick to the stomach if he ate anything other than bread and diluted soup.  *Id.*  Sanney described these symptoms to Dr. Toyama during their first meeting.  *Id.* at 9.

Dr. Toyama clearly considered Sanney's symptoms a "serious medical need," and he treated them as such. Dr. Toyama immediately ordered a chest X-ray, and when that X-ray revealed an "abnormality," he ordered a second chest X-ray. *Id.* at 9. Based on the second set of X-rays, Dr. Toyama prescribed a five-day course of antibiotics that alleviated Sanney's symptoms. *Id.* Sanney acknowledges that his "coughing lessened" and his "appetite slowly returned." *Id.* Sanney was also able to return to his job at the HCF, albeit on light duty. *Id.* Sanney does not allege any other facts suggesting that his symptoms did not continue to improve. Indeed, Sanney acknowledges that as time passed, he thought that he "was healed." *Id.*

When Sanney's symptoms returned "approximately one year later," Dr. Toyama took prompt action. *Id.* He immediately ordered another chest X-ray. *Id.* After the results of the X-rays came back, Dr. Toyama also ordered a CT scan. *Id.* Sanney was then admitted to the QMC. *Id.* Sanney does not allege that Dr. Toyama had any involvement in his medical care after this point. Although Sanney has had two opportunities to do so, he has not plausibly alleged that Dr. Toyama was deliberately indifferent to his medical needs.

Although Sanney asserts that Dr. Toyama should have ordered a CT scan after the first two sets of X-rays were taken, *id.* at 11, as Sanney sets forth, the radiologist said, "*if* further information [was] desired" a CT scan could be done, *id.*

15

at 9 (emphasis added).  Sanney responded well to Dr. Toyama's treatment, however, obviating the need for further imaging.  If Sanney had not responded well to the five-day antibiotic treatment, then Dr. Toyama may have ordered a CT scan, but that is not what Sanney alleges occurred.

Sanney also suggests that, if Dr. Toyama had ordered the CT scan in 2016, his invasive pulmonary aspergillosis would have been discovered sooner.  *Id.* at 11. This is speculation made from the perspective of hindsight, and it represents only Sanney's after-the-fact disagreement with Dr. Toyama's treatment.  When Sanney presented with the same symptoms one year later, Dr. Toyama immediately sent him to have a CT scan.  It is unclear whether Dr. Toyama or a doctor at Pali Momi diagnosed Sanney with tuberculosis.  Regardless, once the diagnosis was made, Sanney was rushed to an isolation unit at the QMC.  After additional tests, within days a specialist at the QMC determined that Sanney had invasive pulmonary aspergillosis and treatment was started.  Even after this treatment concluded, Sanney was monitored, as shown by his statement that he continued voriconazole until a QMC physician discontinued it due to the side effects Sanney experienced.

Nothing within these facts suggests that Dr. Toyama acted with deliberate indifference to Sanney's serious medical needs.  When Dr. Toyama first became involved, he provided Sanney immediate care that improved his condition.  When Sanney became ill again a year later, Dr. Toyama acted quickly to order testing and

16

specialist support.  Even if Dr. Toyama misdiagnosed Sanney's condition initially, and this is not evident, Sanney has not plausibly alleged that Dr. Toyama failed to provide him safe, timely, and adequate medical treatment with deliberate indifference to his health.  Sanney's Eighth Amendment claim against Dr. Toyama is DISMISSED with prejudice.

### 2.   *John Doe 1, Jane Doe 1, and John Doe 2*

Sanney alleges that John Doe 1, Jane Doe 1, and John Doe 2 each violated his rights under the Eighth Amendment by failing (1) to schedule a doctor's appointment for him, and (2) to give him any medication for his "pain and discomfort" over the course of a month beginning in July 2016.  *Id.* at 7, 13. Sanney has not plausibly alleged that any of these Defendants were deliberately indifferent to a serious medical need.

John Doe 1 met with Sanney during his first visit to the medical unit.  *Id.* at 7.  During this visit, John Doe 1 took Sanney's temperature and blood pressure, and he measured Sanney's weight.  *Id.*  After listening to Sanney's chest with the stethoscope, John Doe 1 said it sounded as though Sanney had pneumonia.  *Id.* Sanney concedes that his symptoms were "consistent with pneumonia" when he met with John Doe 1.  *Id.*  John Doe 1 said that he would schedule a doctor's appointment for Sanney and sent him back to his cell.  *Id.*  Although Sanney claims

that John Doe 1 did not give him any medication, Sanney does not allege that he asked for any.

Jane Doe 1 met with Sanney during his second visit to the medical unit. *Id.* at 7–8. Jane Doe 1 also took Sanney's temperature and blood pressure, and she measured his weight. *Id.* Although Sanney claims that his condition had "continued to deteriorate" since his first visit to the medical unit, he does not allege that he conveyed this information to Jane Doe 1. In fact, Sanney does not allege that he told Jane Doe 1 anything about his first visit to the health unit, including the fact that John Doe 1 allegedly promised to schedule a doctor's appointment. Jane Doe 1 told Sanney that he probably had the flu and she would schedule a doctor's appointment. *Id.* Although Sanney says that he had "hop[ed]" that Jane Doe 1 would give him medication or his pain and discomfort, he does not allege that he asked her for any.

John Doe 2 met with Sanney during his third visit to the medical unit. *Id.* at 8. John Doe 2 took Sanney's temperature and blood pressure, and he measured Sanney's weight. *Id.* While Sanney claims that his condition had "worsened considerably," he does not allege that he explained to John Doe 2 his symptoms during either of his earlier visits to the health unit. Nor does Sanney allege that he told John Doe 2 that two other nurses had promised to schedule a doctor's appointment for him. When Sanney asked for medication or his "aches and

18

discomfort," John Doe 2 explained that he needed to see a doctor first. *Id.* John Doe 2 promised to schedule a doctor's appointment for Sanney. *Id.*

To the extent Sanney claims that John Doe 1, Jane Doe 1, and John Doe 2 should have gotten him to see a doctor sooner, he does not explain why any of them should have suspected that immediate physician attention was required. Sanney does not allege that he told Jane Doe 1 about his "deteriorat[ing]" condition or his initial visit to the health unit. Nor does he allege that he told John Doe 2 about his "considerably" worsened condition or his earlier visits to the health unit. Without this context, Sanney has not plausibly alleged that John Doe 1, Jane Doe 1, or John Doe 2 was deliberately indifferent to his need to see a doctor.

Moreover, to the extent Sanney claims that John Doe 1, Jane Doe 1, and John Doe 2 should have given him medication for his "pain and discomfort," Sanney does not allege that he asked John Doe 1 and Jane Doe 1 for any medicine. When Sanney asked John Doe 2 for medicine, John Doe 2 explained to Sanney that he could not give him any medicine before Sanney met with a doctor. The FAC does not plausibly allege that John Doe 2 was deliberately indifferent to Sanney's need for medicine. Instead, John Doe 2 did not provide Sanney with medicine because he thought that he was not allowed to do so.

As written, the FAC alleges insufficient facts for the Court to conclude that John Doe 1, Jane Doe 1, and John Doe 2 were deliberately indifferent to a serious medical need.  Sanney's claims against these Defendants are DISMISSED with leave granted to amend.

## D.     Doe Defendants

Rule 10(a) of the Federal Rules of Civil Procedure requires the plaintiff to include the names of the parties in the action.  This is because it is usually impossible to serve a summons and pleading on an anonymous defendant.  The use of Doe Defendants is generally disfavored in the federal court.  *See Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980).  Nonetheless, the use of Doe Defendants is sometimes necessary when a plaintiff cannot discover the identity of the defendant before filing the operative pleading.  The burden of identifying and serving a defendant remains at all times on the plaintiff, however, and the Court will not undertake to investigate the name and identity of an unnamed defendant.

If Sanney is able to cure the deficiencies in his claims against John Doe 1, Jane Doe 1, and John Doe 2, he may use the discovery process for a limited period set by the Court to obtain their names, unless it is clear that discovery would not uncover their identities, or that the amended complaint will be dismissed on other grounds.  *Wakefield v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999) (citing *Gillespie*, 629 F.2d at 642).

**E.     Motion for Appointment of Counsel**

Although a federal court "may request an attorney to represent any person unable to afford counsel," 28 U.S.C. § 1915(e)(1), it does not have the authority "to make coercive appointments of counsel." *Mallard v. U.S. Dist. Ct. for S. Dist. of Iowa*, 490 U.S. 296, 310 (1989).  The appointment of counsel pursuant to 28 U.S.C. § 1915(e)(1) is limited to cases presenting "exceptional circumstances." *Palmer v. Valdez*, 560 F.3d 965, 970 (9th Cir. 2009).  In determining whether "exceptional circumstances" exist, courts consider "the likelihood of success on the merits as well as the ability of the [plaintiff] to articulate his claims *pro se* in light of the complexity of the legal issues involved." *Id.* (internal quotation marks and citation omitted).  Neither of these considerations is dispositive, so they must be viewed together.  *Id.*

Sanney's action does not present exceptional circumstances.  The issues presented are not complex, the Court has already determined that he is unlikely to succeed on the merits of his claims as presented, and judging by the FAC, Sanney is well-able to articulate his claims *pro se*.  Accordingly, Sanney's Motion for Appointment of Counsel is DENIED without prejudice.

## IV. <u>LEAVE TO AMEND</u>

The First Amended Complaint is DISMISSED with leave granted to amend consistent with this Order on or before Wednesday, July 7, 2021. The amended pleading must cure the deficiencies noted in this Order. Sanney may not expand his claims beyond those already alleged or add new claims, without explaining how those new claims relate to the claims alleged in the original Complaint.

Sanney must comply with the Federal Rules of Civil Procedure and the Local Rules for the District of Hawaii. An amended pleading must be submitted on the court's prisoner civil rights form and it will supersede the preceding complaint. *See Ramirez v. County of San Bernardino*, 806 F.3d 1002, 1008 (9th Cir. 2015); LR10.4. Defendants not renamed and claims not realleged in an amended complaint may be deemed voluntarily dismissed. *See Lacey v. Maricopa County*, 693 F.3d 896, 928 (9th Cir. 2012) (en banc). If Sanney fails to file an amended complaint that cures the deficiencies in his claims, this action may be automatically dismissed and may count as a "strike" under 28 U.S.C. § 1915(g).[7]

---

[7] Section1915(g) bars a civil action by a prisoner proceeding in forma pauperis:

> if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).

# V.  <u>CONCLUSION</u>

(1)  The "Halawa Medical Unit" and the "Medical Unit Staff and Admin Team" are TERMINATED.

(2)  Sanney's claims for money damages and prospective declaratory or injunctive relief against Defendants in their official capacities are DISMISSED with prejudice.

(3)  Sanney's denial-of-medical-care claim against Dr. Toyama is DISMISSED with prejudice.

(4)  Sanney's denial-of-medical-care claims against John Doe 1, Jane Doe 1, and John Doe 2 are DISMISSED with leave granted to amend.

(5)  Sanney must file an amended pleading that cures the deficiencies in these claims on or before Wednesday, July 7, 2021.  Failure to file an amended pleading that cures the noted deficiencies in his claims may result in dismissal of this action without further notice and incur a strike pursuant to 28 U.S.C. § 1915(g).

(6)  Sanney's Motion for Appointment of Counsel is DENIED without prejudice.

———————————

(7)  The Clerk is DIRECTED to send Sanney a prisoner civil rights complaint form so that he may comply with the directions of this Order.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, May 28, 2021.



Helen Gillmor
Senior United States District Judge